**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2021

(Argued: June 1, 2022      Decided: July 22, 2022)

Docket No. 21-2786

_____

RISEANDSHINE CORPORATION, DBA Rise Brewing,

*Plaintiff-Appellee,*

v.

PEPSICO, INC.,

*Defendant-Appellant,*

_____

Before:

LEVAL, CHIN, and MENASHI, *Circuit Judges.*

In a trademark dispute under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and New York law, Defendant-Appellant PepsiCo, Inc., which sold a canned energy drink under the mark "MTN DEW RISE," appeals from a preliminary injunction imposed by the United States District Court for the Southern District of New York (Schofield, *J.*), at the instance of Plaintiff-Appellee RiseandShine Corporation, which sells a canned coffee drink under the name "RISE." Because we find that the district court erred assessing the strength of Plaintiff's mark and the similarity of the products, we VACATE the preliminary injunction.

PAUL TANCK, Alston & Bird LLP, New York, NY (Kirk T. Bradley, Alston & Bird LLP, Charlotte, NC; Jason D. Rosenberg, Holly H. Saporito, Alston & Bird LLP, Atlanta, GA, *on the brief*), *for Plaintiff-Appellee*.

DALE M. CENDALI, Kirkland & Ellis LLP, New York, NY (Luke Ali Budiardjo, Kirkland & Ellis LLP, New York, NY, Julie M.K. Siegal, Kirkland & Ellis LLP, Washington, D.C.; Macey Reasoner Stokes, Christopher E. Tutunjian, Baker Botts LLP, Houston, TX, *on the brief*), *for Defendant-Appellant*.

LEVAL, *Circuit Judge*:

In a trademark dispute under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and New York's law of trademark and unfair competition, PepsiCo, Inc., the Defendant, which marketed a canned energy drink under the mark "MTN DEW RISE ENERGY," appeals from a preliminary injunction imposed on it by the United States District Court for the Southern District of New York (Lorna Schofield, *J.*) at the instance of the Plaintiff, RiseandShine Corporation, d/b/a Rise Brewing ("Rise Brewing"), which sells nitro-brewed canned coffee (and also canned tea) under the name RISE. It is undisputed that Plaintiff began using the

RISE mark prior to Defendant's use of its mark. The district court concluded that Defendant's conduct in using RISE caused a likelihood of confusion and that Plaintiff was likely to succeed on the merits.

We find that the grant of a preliminary injunction was premised on two significant errors. We therefore vacate the preliminary injunction.

## BACKGROUND

Founded in 2014, Plaintiff launched its first cans of nitro-brewed coffee in 2016. It now sells these canned beverages nationwide in major stores, such as Walmart, Publix, and Kroger. Plaintiff uses "RISE" as a mark referring to its product and has registered "RISE BREWING CO." as a word mark, Reg. No. 5,168,377, and its RISE BREWING CO. logo as a design mark, Reg. No. 5,333,635, shown below.



Plaintiff displays this design mark on every can. The mark consists of the word "RISE" in large, red, regular capital letters in simple, unadorned, sans-serif font on a horizontal line, set against a light background with thin yellow lines radiating from the word "RISE," mimicking rays of sunshine. The words "Brewing Co." appear below "RISE" in a much smaller, similar, simple font on a horizontal line. **[A-212].** This design takes up approximately the top third of the 7-ounce can, as shown below. The lower part of the can is in a uniform color, with "NITRO COLD BREW COFFEE" in the same simple typeface on a horizontal line.



In January 2021, Plaintiff learned that Defendant planned to launch a fruit-flavored canned energy drink under the mark MTN DEW RISE ENERGY. Plaintiff sent a demand letter, asking Defendant to "abandon any intent to use the RISE mark, or any confusingly similar RISE mark, in connection with any

canned or caffeinated beverage." App'x at 356. Defendant's counsel sent a reply, stating that they did not see "any merit" to Plaintiff's claims. App'x at 368. The parties were unable to arrive at a resolution.

In March 2021, Defendant launched its MTN DEW RISE ENERGY product. MTN DEW RISE ENERGY came in a variety of sweet, fruity flavors, such as Pomegranate Blue Burst, Tropical Sunrise, and Strawberry Melon Spark. The 16-ounce cans were sold in over 170,000 retailers across the country, including convenience stores, gas stations, and drug stores.

Defendant's packaging, as depicted below, features a variety of bright colors corresponding to its various flavors. The word "RISE" appears on the top third of the cans in a large, stylized jagged font in ornate letters displayed in an arc, followed by the word "ENERGY" running vertically up its side in a much smaller font. The MTN DEW house mark, consisting of the words "MTN DEW," slants diagonally toward the upper right above the word "RISE." Below "RISE" is a stylized lion logo composed of geometric shards.



Plaintiff brought this suit in the U.S. District Court for the Northern District of Illinois. On motion of Defendant, the suit was transferred to the U.S. District Court for the Southern District of New York. Plaintiff moved for, and the district court granted, a preliminary injunction, enjoining Defendant from using or displaying the challenged mark in the market, pending trial.

**DISCUSSION**

**I.      Preliminary Injunction**

A party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Where a mark warrants protection under the Lanham Act, "both the likelihood of success on the merits and the potential for irreparable harm in the absence of preliminary

relief may be demonstrated by a showing that a significant number of consumers are likely to be misled or confused as to the source of the products in question." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1038 (2d Cir. 1992).

## II.     Likelihood of Confusion

To prevail in a federal trademark infringement claim, a plaintiff "must demonstrate that . . . the defendant's actions are likely to cause confusion with [that] mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (internal quotation marks omitted). Here, Plaintiff argues that Defendant's use of the word "Rise" created a likelihood of *reverse* confusion. Reverse confusion occurs when consumers "believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991).

Plaintiff contends that Defendant's use of the word "Rise" was likely to result in consumers mistakenly concluding that Plaintiff's coffee drink was a Mountain Dew product, thus creating consumer confusion in the marketplace. To evaluate claims of consumer confusion, this court employs the eight factors set out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961):

"[T]he strength of [the plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the [plaintiff] will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *Id.* at 495.

In general, this court reviews the grant of a preliminary injunction for an abuse of discretion. *Bristol-Myers Squibb*, 973 F.2d at 1038. "Applying legal standards incorrectly or relying upon clearly erroneous findings of fact may constitute an abuse of discretion." *Id.* Where "the determination of whether one of the *Polaroid* factors favors one party or another involves a legal judgment—which it often does—we must review that determination *de novo*." *Tiffany & Co.*, 971 F.3d at 86.

Having considered these eight factors, the district court found that Plaintiff had met its burden of showing a sufficient likelihood of success on the merits to warrant a preliminary injunction. We disagree and find that the district court erred in its evaluation of what is often the most important factor—the strength of Plaintiff's mark—as well as in its finding of similarity in the appearance of the products.

**A.    Strength of the Mark**

In considering the first factor, the strength of the plaintiff's mark, the district court found that it slightly favored Plaintiff. *RiseandShine Corp. v. PepsiCo, Inc.*, 2021 WL 5173862, at *7 (S.D.N.Y. Nov. 4, 2021). We disagree. The district court failed to recognize the inherent weakness of Plaintiff's mark. Its determination that this factor favored Plaintiff was affected by that failure, as was its ultimate conclusion that Plaintiff was likely to succeed on the merits.

"[T]he strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131–32 (2d Cir. 1979), *superseded on other grounds by* Fed. R. Civ. P. 52(a). The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength. *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993).

We turn first to inherent strength. Inherent strength or weakness of a mark is frequently an important factor because strong marks command a wider scope of protection than weak marks. The trademark law allows every marketer to

identify itself as a product's source by use of a distinctive mark, which will allow the public to recognize it as the source of the product, rewarding the marketer if it has earned a good public reputation and punishing it if the public's prior experience has been disappointing. In this manner, the trademark law serves the purposes of both marketers and the consuming public. So long as marketers select words or signs that have no logical relationship to the products or services on which they are used, there will never be a shortage of marks. Trademark law favors the use of marks that are arbitrary or fanciful in relation to the products on which they are used. This is because such distinctive marks make it easier for the public to avoid confusion and because allowing the owner a broad exclusivity for such a mark detracts little from free expression, as other marketers of similar products have no justified interest in using such words to identify their products. *See discussion at* Pierre N. Leval, *Trademark: Champion of Free Speech*, 27 COLUM. J.L. & ARTS 187, 194 (2004). In contrast, trademark law offers a much narrower scope of protection to marketers who seek to bar others from using words that describe or suggest the products or the virtues of their products. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 147-48 (2d Cir. 2003) ("[A]s a matter of policy, the trademark law accords broader protection to marks that serve

exclusively as identifiers and lesser protection where a grant of exclusiveness would tend to diminish the access of others to the full range of discourse relating to their goods.").

To describe different degrees of inherent distinctiveness, the trademark law utilizes four categories. In order of ascending strength, they are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.

A generic mark is a common name, such as automobile or aspirin, that identifies a kind of product. *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993). A mark that consists of a generic identifier of the product receives no protection from the law of trademark, even if the mark has acquired public recognition as identifying the source of the product. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Neither prior use, nor public recognition as a source identifier can justify denying others the right to refer to their product as what it is.

One rung above the unprotectable generic marks are descriptive marks. These are marks that "tell[] something about a product, its qualities, ingredients or characteristics." *Gruner*, 991 F.2d at 1076. Descriptive marks are presumptively unprotectable, but can acquire a degree of protection if they have acquired

secondary meaning, *i.e.* an acquired public recognition as a mark identifying the source. *Id.*

Suggestive marks occupy the next higher rung. Suggestive marks suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage. *Id.* They are the weakest marks that are protectable without need to show acquired secondary meaning. They receive a narrower scope of protection than the protection accorded to arbitrary or fanciful marks—those at the top of the ladder. *Id.* at 1075

Arbitrary and fanciful marks – *i.e.*, those that make no logical reference to the product or service on which they are used, such as Google for a search engine, Kodak for cameras, or Quilted Giraffe for a restaurant, receive the strongest protection. *Id.* This is because other marketers of the same products or services have no justification or cognizable interest in using the same terms in referring to their own market offerings.

The district court determined that Plaintiff's mark was "suggestive," noting that the word "Rise" "evokes images of morning, which 'suggest[s] a quality or qualities of the product through the use of imagination, thought, and perception.'" *RiseandShine*, 2021 WL 5173862, at *7 (quoting *Star Indus., Inc. v.*

*Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005)). We find no error in the district court's determination that Rise Brewing's mark is "suggestive." But labeling a mark as "suggestive" is not the end of the inquiry. *See Lang*, 949 F.2d at 581 ("[S]uggestiveness is not necessarily dispositive of the issue of the strength of the mark.").

"[A] finding of suggestiveness does not guarantee a determination that the mark is a strong one." *W.W.W. Pharm. Co.*, 984 F.2d at 572. Because suggestive marks, by their nature, seek to suggest the qualities of the product, it can be difficult to distinguish weak suggestive marks from descriptive ones. Like descriptive marks, instead of focusing on the favored goal of source identification, suggestive marks aim to secure the exclusive right to an advertising message that is built into the trademark. *See* Leval, *Trademark: Champion of Free Speech* at 193. The district court failed to note that the strong logical associations between "Rise" and coffee represent weakness and place the mark at the low end of the spectrum of suggestive marks. *See, e.g.*, *Star Indus.*, 412 F.3d at 385 ("Star's mark is suggestive, but just barely.").

This mistake constituted legal error. While this Court has said, at times, that the classification of a mark is a factual matter, *Bristol-Myers Squibb*, 973 F.2d

at 1039-40, we have also stated that there is an undeniable legal element in the determination of how much strength a given mark commands, *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 216 (2d Cir. 2003) ("[T]here is a considerable component of law in the determination whether a mark has the degree of strength necessary to weigh in favor of the party claiming infringement."), *abrogated on other grounds by 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202 (2d Cir. 2019).[1]

In its ordinary usage, "Rise" suggests waking up and "rising" from bed. Rising is generally associated with the morning, a time when many crave a cup of coffee, relying on its caffeine to jumpstart their energy for the day. The intended and achieved reference of the RISE mark is illustrated by Plaintiff's company name—RiseandShine—something that a morning cup of coffee helps

---

[1] If a marketer chose "Toothpaste" as a mark for a toothpaste and sought to prevent other toothpaste makers from use of the word "toothpaste," the factfinder would not have discretion to find that the plaintiff's mark was anything other than generic and unprotected. By the same token, if the marketer took the mark "Green Hippopotamus" for its toothpaste, factfinders would not be at liberty to find that such a mark was anything other than arbitrary or fanciful, belonging in the highest rung entitled to the strongest protection. Between descriptive and suggestive marks, there may be some room for difference of opinion; nonetheless, the discretion allowed to a factfinder in finding inherent strength is minimal at best. *See Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (holding that the district court's classifying of a mark as descriptive as opposed to suggestive was clear error and error as a matter of law). If the toothpaste mark was "Pure White" or "Fresh Breath," the descriptive or suggestive relationship of such marks to the product are so clear that it would be error for the factfinder to place such marks in either the highest (arbitrary or fanciful) category or the lowest generic category.

us to do. The proposition that one isn't fully awake until one has had one's morning coffee is a cliché.

The word "Rise" may also refer directly to energy itself; after consuming caffeine, one's energy levels can be expected to "rise." The trademark law does not favor giving one marketer an exclusive right to prevent others from using such valuable marketing terms in their own marketing campaigns. When a mark so clearly evokes the claimed virtues of the product it references, that mark, although perhaps muscular as a marketing tool, is weak under the trademark law. *See Star Indus.*, 412 F.3d at 385; *see also Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1196-97 (S.D.N.Y. 1979) (finding that a word used as a mark "to convey, through that word's primary meaning, a quality of the product or of a promised consumer reaction to its use," "lack[ed] originality and uniqueness."), *aff'd*, 636 F.2d 1203 (2d Cir. 1980). The close associations between the word "Rise" and coffee constituted a weakness of the mark under the trademark law, which reduced, rather than advanced, Plaintiff's likelihood of success on the merits. Because the word "Rise" is so tightly linked with the perceived virtues of coffee, the mark is inherently weak and commands a narrow scope of protection.

Although the suggestive category is higher than the descriptive category because a descriptive association between mark and product is more direct than a suggestive association, it does not necessarily follow that every suggestive mark is stronger than every descriptive mark. If the suggestion conveyed by a suggestive mark conjures up an essential or important aspect of the product, while the description conveyed by a descriptive mark refers to a relatively trivial or insignificant aspect of the product, the particular suggestive mark could be deemed weaker than the descriptive. Coffee's capacity to wake one up and lift one's energy, which is what the "RISE" mark suggests, is such an important part of the perceived virtue of coffee in the eyes of the consuming public as to render this suggestive mark decidedly weak.

A survey of the use of the term "Rise" in the beverage market further underlines the weakness of the mark. Extensive third-party usage of a mark in related products generally weighs against a finding that a trademark is strong. *See, e.g., Lang*, 949 F.2d at 581. "[I]n a 'crowded' field of similar marks, each member of the crowd, is relatively 'weak' in its ability to prevent use by others in a crowd." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:85, at 11-163 (4th ed. 2001). This is especially true where both

the plaintiff's product and the other products use the word to signify the same ordinary meaning. *See, e.g., Plus Prod. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir. 1983); *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998).

Although, as the district court points out, Plaintiff appears to have been "the exclusive user of the principal term 'RISE' to identify a single-serving, canned caffeinated beverage," *RiseandShine*, 2021 WL 5173862, at *7, there were already a number of marks using "Rise" on coffee drinks and other similar products when Plaintiff began to use its mark. Defendant presented evidence of over 100 uses of the term "Rise" in connection with coffee, tea, bottled beverages, energy drinks, soft drinks, drinkable health supplements, cafes, yogurts, and granolas. App'x at 334-345. Many of these products use "Rise" in the same way as Plaintiff does—to allude to increased energy, particularly in the morning hours.

Plaintiff itself acknowledged this crowded field in its application to the United States Patent and Trademark Office ("PTO"). It initially attempted to register the mark "RISE COFFEE CO." but was rejected by the PTO on the basis that there was a likelihood of confusion between "RISE COFFEE CO." and prior

registrations that also used the word "Rise" for coffee, such as "Rise Up Coffee Roasters" and "Rise Up Organic Coffee." Plaintiff objected to the PTO's determination, arguing that the presence of multiple marks using the word "Rise" indicated the mark's weakness: "[M]any entities have used the word 'Rise' in relation to the Applicant's goods, making it unlikely that consumers would give significant weight to this term in ascertaining the source of such goods." App'x at 349. Plaintiff further elaborated, "The fact that there are multiple Rise-formulated coffee marks owned by different registrants peacefully coexisting without confusion shows that there is room for another Rise-formulated mark…." *Id.* After Plaintiff modified its application to register "RISE BREWING CO." rather than "RISE COFFEE CO.," the PTO agreed to register the mark.

Now, having registered its trademark, Plaintiff argues that there is no such room for multiple "Rise" marks to coexist peacefully, even outside the coffee sector. That is not persuasive. If there was room for Plaintiff's use of "Rise" in the already crowded coffee field, there would also be room for Defendant's, especially on a product that is distinct from coffee.[2] Trademark law does not

---

[2] The district court discounted the weight of the statements Plaintiff made to the PTO on the basis that "courts do not bind parties to their statements made or positions taken in ex parte application

offer robust protection to those who demand the exclusive right to use words that describe or suggest a product or its virtues. Given the inherent weakness of "Rise" for coffee, the first factor does not favor Plaintiff.

Finally, as a factor supporting acquired strength in Plaintiff's mark, the district court noted that Plaintiff "ha[d] invested more than $17.5 million in promoting its 'RISE' marks." *RiseandShine*, 2021 WL 5173862, at *7. The holders of senior marks that are not inherently strong but have achieved a measure of consumer recognition through longevity of use or through publicity often reasonably point to that acquired public recognition as fostering a likelihood that customers will believe, to the senior user's detriment, that a product sold by an allegedly infringing junior user under a similar mark came from the plaintiff. Defendant argues, however, that where a plaintiff claims it will be the victim of reverse confusion—in that consumers will believe that its product comes from the junior user—a plaintiff's showing of acquired strength of its mark does not support its claim.

---

proceedings in front of the PTO." *RiseandShine*, 2021 WL 5173862, at *7 (quoting *Alpha Media Grp., Inc. v. Corad Healthcare, Inc.*, No. 13 Civ. 5438, 2013 WL 5912227, at *3 (S.D.N.Y. Nov. 4, 2013)). In our view the question is not whether Plaintiff is bound by its previous position. If the RISE mark for coffee was sufficiently weak for the PTO to allow Plaintiff to enter as a new user in spite of numerous prior users, it is also sufficiently weak to now allow Defendant as still another user.

We see some merit in Defendant's argument. Just as, in cases of forward confusion, increased consumer awareness of a plaintiff as the source of the plaintiff's products bearing its mark tends to increase the likelihood that consumers will believe that another product bearing a confusingly similar mark also comes from the plaintiff, in cases of reverse confusion that same consumer awareness of a plaintiff as the source of its products bearing its mark tends to diminish the likelihood that consumers, on seeing another product bearing a similar mark, will believe that the plaintiff's products come from the source of the other product. On the other hand, where, as here, the junior user is a much larger company, consumers might believe that the senior user's success in promoting its brand had led the larger junior user to acquire the senior.

We are aware of no court decisions on the question, and we need not resolve it for this case. Notwithstanding Plaintiff's expenditure of $17.5 million in publicity, Plaintiff has not shown that its RISE mark has achieved sufficient acquired strength to counterbalance the inherent weakness of its mark.

Although we "generally do not treat any one *Polaroid* factor as dispositive in the likelihood of confusion inquiry," *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000), "the evaluation of the *Polaroid* factors is not a

mechanical process where the party with the greatest number of factors weighing in its favor wins," *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir. 1993) (internal quotation marks omitted). Weak marks are entitled to only an "extremely narrow scope" of protection, "unless a convincing combination of other *Polaroid* factors militates strongly in favor of likelihood of confusion." *Plus Prod.*, 722 F.2d at 1006 (2d Cir. 1983). No such circumstances exist here.

### B. Similarity of the Marks

The district court further found that the general appearance of Defendant's mark and trade dress on its canned energy drink was "confusingly similar" to Plaintiff's cans. *RiseandShine*, 2021 WL 5173862, at *8. We believe that finding was clear error. The district court noted that, on both of the parties' products, the word "RISE" was printed in "large typeface, in all-capital letters, in a bright color against a light background and [was] the dominant feature occupying the top third of the can." *Id.* While these observations are accurate, they are so general that they likely also describe many other products in the canned beverage market.

The only notable similarity is the shared use of the term "Rise" in large bold letters. However, as explained above, the word "Rise" in this context is not distinctive. Therefore, without more striking visual similarities, the shared use of this ordinary word, used to signify a virtue of the product, is not enough to render the two products "confusingly similar." *See, e.g., Nabisco*, 220 F.3d at 47 (holding that the shared use of the word "Ice" was unlikely to cause confusion given the differences in the overall appearance of the products). Nor is there anything distinctive about the use of large bold letters to present a drink's brand name.

Comparing the two products, the differences appear far more notable than the similarities. The two cans are different in size, proportion, style, color, and artwork. Even the word "RISE" is presented in very different manners. On Plaintiff's can, it appears in a simple sans-serif font—its "R" and "S" evenly curved. Defendant's can, in contrast, uses an angular and jagged font. Furthermore, while "RISE" on Plaintiff's can is written on a horizontal line, the letters on Defendant's can are arranged in an arc.

Beyond the presentations of the shared word, the overall appearances of the cans are very dissimilar. Plaintiff's seven-ounce can is less than half the size

of Defendant's sixteen-ounce can. Plaintiff's can features warm or neutral colors, in stark contrast to the bright, bold colors of Defendant's cans. The word "RISE" on Defendant's can is partially covered at the top by Defendant's prominently displayed house mark, "MTN DEW." And perhaps most plainly, while the lower half of Plaintiff's can shows simple, regular, white writing against a calm, uniform background, the lower half of Defendant's can depicts a large, stylized lion's head, composed of jagged shards that complement the can's angular font. There is little about the appearance of the two cans that would suggest to a consumer that they come from the same source.

The district court granted Plaintiff a preliminary injunction based in part on the conclusion that Plaintiff was likely to succeed on the merits. This rested in substantial part on the court's conclusion that Plaintiff's mark was strong—both in inherent and acquired strength—as well as its determination that the two products were "confusingly similar." To the extent that Defendant's use of its marks caused any likelihood of confusion, this was because Plaintiff chose a weak mark in a crowded field. For this reason, the balance of hardships did not favor Plaintiff. Plaintiff did not demonstrate a likelihood of success on the merits, and we must overturn the grant of the preliminary injunction.

**CONCLUSION**

For the foregoing reasons, the grant of the preliminary injunction is

VACATED.